Gennaro MECCA and Florence Warehouse, Inc., Plaintiffs,

v.

GIBRALTAR CORPORATION OF AMERICA, Irwin Schwartz and Joseph P. Contreras, Defendants.

No. 86 Civ 5439 (KC).

United States District Court, S.D. New York.

Sept. 4, 1990.

Stephen Greiner, Roger Netzer and Jerome Balsam, Willkie Farr & Gallagher, New York City, for plaintiffs.

Joseph Contreras, Jersey City, N.J., pro se.

Weil Gotshal & Manges, New York City, Irwin H. Warren and Richard Levine, for defendants.

## MEMORANDUM AND ORDER

CONBOY, District Judge:

Plaintiffs Gennaro Mecca and Florence Warehouse, Inc., brought this action against defendants Gibraltar Corporation of America ("Gibraltar") and Irwin Schwartz (collectively, the "Gibraltar Defendants") and Joseph P. Contreras, alleging violations of the Racketeer Influenced and Corrupt Organizations Act ("R.I.C.O."), Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, Sections 12(2) and 15 of the Securities Act of 1933, and common law fraud and misrepresentation, negligent misrepresentation, breach of duty to disclose and breach of contract. After a nine-week trial, from January 9 through March 14, 1990, the jury returned a verdict in favor of the plaintiffs on only their Sections 12(2) and 15 claims, finding Contreras primarily liable and the Gibraltar defendants liable as control persons. The

jury awarded plaintiffs $900,000 in damages. In a supplemental proceeding on the Gibraltar Defendants' claim for contribution from Contreras, the jury apportioned the damages among the defendants as follows: 60% to Gibraltar, 20% to Schwartz, and 20% to Contreras.

All three defendants now move for judgment notwithstanding the verdict ("j.n.o.v.") pursuant to Rule 50(b) of the Federal Rules of Civil Procedure, or in the alternative, for a new trial pursuant to Rule 59 of the Federal Rules of Civil Procedure. In addition, the plaintiffs move for an award of prejudgment interest. For the reasons set forth below, the motions are denied.

## DISCUSSION

### I. MOTIONS FOR JUDGMENT NOTWITHSTANDING THE VERDICT

"Judgment n.o.v. may be entered only if, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached." *Heller v. Champion Int'l Corp.*, 891 F.2d 432, 434 (2d Cir.1989) (quotation marks and citations omitted). Thus, a motion for j.n.o.v. should be granted when:

> "(1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or
>
> (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men [and women] could not arrive at a verdict against him."

*Katara v. D.E. Jones Commodities*, 835 F.2d 966, 970 (2d Cir.1987) (quoting *Mattivi v. South African Marine Corp.*, "*Huguenot*", 618 F.2d 163, 167–68 (2d Cir.1980)). In ruling on the j.n.o.v. motions, we must "consider the evidence in the light most favorable to the party against whom the motion was made and ... give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence." *Smith v. Lightning Bolt Productions*, 861 F.2d 363, 367 (2d Cir.1988).

### A. Gibraltar Defendants

■■■ We note at the outset that, as a general matter, the Gibraltar Defendants paint a very rosy picture of the trial, fully crediting Irwin Schwartz's testimony and highlighting their "full[ ] exonerat[ion] on all claims other than control person liability," Gibraltar Defendants' Reply Memorandum in Support of Their Post–Trial Motions and Memorandum in Opposition to Plaintiffs' Cross–Motion for Pre–Judgment Interest ("Gibraltar Defendants' Reply Mem.") at 28, which the Gibraltar Defendants characterize as a "strict liability" claim. *Id.* at 3, n. 1 and 28. As the plaintiffs point out, however, the Gibraltar Defendants were not necessarily "fully exonerated" of wrongdoing on the claims where liability was not found, as those claims required plaintiffs to prove reliance and causation, elements that are not required on a Section 12(2) claim. Plaintiffs' Reply Memorandum of Law in Further Support of Their Cross–Motion for Prejudgment Interest ("Pltf. Reply Mem.") at 5, n. 4. Moreover, control person liability in connection with Section 12(2) is not a "strict liability" provision; the Gibraltar Defendants could have avoided liability if they had proven to the jury by a preponderance of the evidence either that they lacked knowledge of or reasonable ground to believe the existence of the facts by reason of which Contreras's liability was found to exist, or that they acted in good faith. As discussed below, the jury reasonably rejected both of these defenses. Thus, the Gibraltar Defendants' depiction of the trial as a nearly complete vindication that somehow entitles them to credit all of Irwin Schwartz's testimony is inaccurate and incomplete.

Specifically, the Gibraltar Defendants argue that the jury's verdict finding them liable as control persons for Contreras's violation of Section 12(2) should be set aside on the grounds that: (1) there is insufficient evidence establishing that the Gibraltar Defendants controlled Contreras; (2) the Gibraltar Defendants met what the Court held to be their burden of proving

that they did not have actual knowledge of Contreras's violation of Section 12(2); (3) the Gibraltar Defendants met their burden of proving their good faith defense under Section 12(2); (4) there is insufficient evidence establishing that plaintiffs' Section 12(2) claim was filed within the statutory one-year period from the time when the plaintiffs should have reasonably discovered the untrue statements; and (5) there is insufficient evidence establishing that plaintiffs proved any damages under their Section 12(2) claim. In addition, the Gibraltar Defendants argue that the jury's apportionment of its $900,000 damage award among Contreras, Gibraltar and Schwartz is unsupported by the record. We address each of these arguments in turn.

■ First, the evidence was sufficient to support a finding that the Gibraltar Defendants controlled Contreras. As the Court instructed the jury, control means possession of direct or indirect power over the primary violator, so that "[e]ven indirect means of discipline or influence short of actual direction fulfill the requirement" of control. Tr. 5711.[1] There was ample evidence of the Gibraltar defendants' influence over Contreras. Even before learning of Contreras's prebilling and unauthorized movement of equipment, Gibraltar had power over him, because Corona needed financing, and Gibraltar retained discretion as to how much financing to provide. Tr. 4254. Had Gibraltar ceased financing, Corona would have been unable to continue doing business, rendering Contreras personally liable on his guarantees to Gibraltar and to the noteholders of Contreras Enterprises. Tr. 1676–77, 1839, 4254–55, 4370–71.

According to the Gibraltar Defendants, such influence was no different from the influence any lender exercises over its debtors. After the Gibraltar Defendants' discovery of Contreras's misconduct on Washington's Birthday in 1985, however, the evidence showed that their power over Contreras intensified, as they became more of a partner to Contreras than a lender. As Contreras was no doubt aware, his frauds, which constituted crimes, entitled Gibraltar to declare an immediate default and to have criminal charges brought against him. Tr. 1839. Instead, Schwartz told Contreras he would not go to the Attorney General "if [they] worked together and [Contreras told] the truth." Tr. 1793. Consequently, Contreras submitted to the occupation by Harvey Friedman of Corona's Denville offices, and he permitted Sheldon Stein to oversee the inventory at Corona's Whippany facility. Tr. 1821–22. Moreover, Gibraltar required Estee Lauder to pay for a shipment in advance, although Contreras thought this would hurt relations with Corona's most important customer. Tr. 1835–36, 2086–87, 4265–68. Contreras also depended on Gibraltar's consent to the shipment of additional equipment to Mexico, which was crucial to the survival of his business. Tr. 201–02, 3565, 3681–82. Finally, during Contreras's negotiations with Mecca and his representatives, he failed to disclose the reasons for Gibraltar's termination of funding, behavior consistent with Gibraltar's control and Schwartz's own misleading conduct. Tr. 251–54, 3024–25. The jury was entitled, based on these examples, to find that Gibraltar exercised control over Contreras much more threatening and pervasive than that of an ordinary lender.

■ Second, the jury could reasonably have concluded that the Gibraltar Defendants did not prove they lacked knowledge of or reasonable ground to believe the existence of facts by reason of which Contreras was found liable.[2] For example, the evidence showed that the Gibraltar Defendants knew that Contreras was selling a security, since 1) between March 26 and April 15, 1985, Jay Benenson advised

1. "Tr. [page number]" indicates a reference to the trial transcript.

2. As discussed below, see *infra* at 347–48, the Court charged the jury that, to avoid control person liability, it was defendants' burden to prove, by a preponderance of the evidence, that they lacked knowledge or reasonable ground to believe the existence of facts by reason of which Contreras was found liable. The Gibraltar Defendants understandably objected to this portion of the charge.

Schwartz that negotiations were going forward and that Mecca was "going to take an option position to acquire the stock of the two companies," Tr. 3855, and 2) both John Mazzanti (Tr. 383) and Jay Benenson (Tr. 3860–61) testified that the options were read aloud at the closing at Gibraltar's offices. The jury could also have inferred that the Gibraltar Defendants knew that Contreras was making material misrepresentations and omissions, as there were frequent conversations between Contreras and Schwartz during the period that the plaintiffs negotiated their investment. Tr. 1821, 1987–90. Moreover, the jury could have concluded, both the Gibraltar Defendants and Contreras concealed from plaintiffs the history of pre-billing and unauthorized movement of equipment. Tr. 322–23, 3851–53.[3]

■ Third, the jury was entitled to find, based on evidence that the Gibraltar Defendants gave the plaintiffs misleading answers to inquiries about Corona and Contreras, that the Gibraltar Defendants did not prove their good faith defense. We recognize that Schwartz told plaintiffs that Contreras was "a high liver," Tr. 322–23, 3851–52, and that Gibraltar would no longer lend to Corona because the company's losses were leading to a point where Gibraltar would no longer be secure, Tr. 324. Schwartz was nevertheless far from "brutally honest," Memorandum in Support of Gibraltar Defendants' Motion for Judgment Notwithstanding the Verdict or, in the Alternative, for a New Trial ("Gibraltar Defendants Mem.") at 24, with the plaintiffs, as he "admittedly did not tell plaintiffs about the pro forma invoicing." *Id.* In addition, Schwartz's testimony about having informed Jay Benenson about the unauthorized movement of equipment to Mexico was contradicted. Tr. 3851–53. Thus, the jury could reasonably have rejected the Gibraltar Defendants' good faith defense, concluding that their limited disclosures were designed to obscure the facts that the plaintiffs needed to know concerning the pre-billing and the unauthorized

movement of equipment, which might have dissuaded plaintiffs from investing.

■ Fourth, there was sufficient evidence in the record to support a finding that the plaintiffs' Section 12(2) claim was filed within the statutory one-year period from the time when the plaintiffs should have reasonably discovered the untrue statements. *See* Section 13 of the Securities Act, 15 U.S.C. § 77m; *Cohen v. Prudential–Bache Securities, Inc.,* 713 F.Supp. 653, 662–63 (S.D.N.Y.1989). The jury was entitled to find that plaintiffs did not discover, and would not in the exercise of reasonable diligence have discovered, the pre-billing and unauthorized movement of equipment until October of 1985, when FBI interrogations led to the disclosure of pre-billing. Tr. 462. This discovery in turn precipitated plaintiff's painstaking review of clandestine documents that provided a key to decoding the pre-billing records. Tr. 5219–20, 5226–28. Taking the evidence in the light most favorable to plaintiffs, the complaint was therefore timely when filed less than one year later on July 10, 1986.

■ Furthermore, the jury was permitted to determine that plaintiffs' inquiries of Gibraltar and its employees—concerning Contreras's character and the reasons for the termination of the relationship between Gibraltar and Corona—constituted reasonable diligence. Plaintiffs' questions, had they been truthfully and completely answered, would probably have disclosed Contreras's prior misconduct.

The Gibraltar Defendants contend that an examination of Corona's books and records would have disclosed a suspiciously large volume of credits, which in turn would have put plaintiffs on notice that they should inquire further before investing in Corona. This argument ignores the evidence that plaintiffs' investigation into Corona focused on the company's current insolvency and turnaround potential, not on its bookkeeping practices during a bygone period. More problematically, the argu-

---

**3.** The Gibraltar Defendants rely heavily on Irwin Schwartz's testimony that he told Benenson about the unauthorized movement of equip-

ment. The jury could, of course, have found that testimony incredible, especially since Benenson testified otherwise.

ment relies on a disputed assumption: that Corona's books and records were accessible to plaintiffs in a manner that would facilitate discovery of the credits. *See* Plaintiffs' Memorandum of law in Opposition to Defendants' Motions for Judgment Notwithstanding the Verdict and for a New Trial and in Support of Plaintiffs' Cross-Motion for Prejudgment Interest ("Pltf. Mem.") at 5 and n. 3. In any event, Contreras, as the jury heard during the trial, was capable of explaining away problems through new deceptions, Tr. 5246–48, so the discovery of the credits would not necessarily have led to the discovery of the pre-billing.

■ Fifth, there was sufficient evidence in the record to support the jury's award of damages. Section 12(2) permits a purchaser of a security "to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security." 15 U.S.C. § 77*l*(2). The option agreements expressly defined the "consideration" paid by plaintiffs to consist of an initial sum of $1.3 million (paid to Gibraltar) and further "consideration" consisting of funds made available to Corona during its Chapter 11 proceeding. *See* Plaintiff's Exhibits 33 & 34 (attached to Affidavit of Stephen Greiner, sworn to on May 18, 1990 ("Greiner Aff.") as Exhibits 3 & 4). The jury heard evidence of the "further consideration" plaintiffs paid for the options: Mecca made funds available to Corona during its Chapter 11 proceeding in an amount totaling $4,975,145 in principal over and above the initial $1.3 million. *See* Plaintiffs' Exhibit 196 (Greiner Aff. as Exhibit 5). The jury likewise heard evidence of the amounts that would have been realized by plaintiffs had they liquidated their collateral. *See* Plaintiffs' Exhibits 197, 233, 233A, 234, 234A (Greiner Aff. Exhibits 6, 7, 8, 9 & 10). This evidence justified a verdict of $900,000.

The Gibraltar Defendants argue that the plaintiffs did not pay anything for the op-

tions, Gibraltar Defendants' Mem. at 32–36, because the plaintiffs paid Gibraltar *in exchange for* the assignment of Gibraltar's lien, which was, according to Schwartz, worth well over $1.3 million as of April 19, 1985. Tr. 2125–26.[4] There was, however, evidence that the plaintiffs had no intention, reason, or obligation to liquidate the collateral on April 19, 1985, a step that would have been inconsistent with their option on equity and with their intention to make further cash infusions to foster appreciation of that equity's value. Since no liquidation occurred on April 19, plaintiffs received no "income," as that term is used in Section 12(2), to be subtracted from the consideration they paid for the securities. Until foreclosure occurred, no income was received. Finally, the fact that plaintiffs obtained a security interest in collateral in return for their initial advance of $1.3 million does not detract from the initial advance's primary function as partial consideration for the options. *See* Pltf. Mem. at 14 and n. 11.

The Gibraltar Defendants further contend that the "further consideration" was not, "in a legal sense or in reality," valid consideration which can form a basis for plaintiffs' damage claim under Section 12(2). Gibraltar Defendants Mem. at 36–37. As to the "legal sense" part of this argument, we note that the Gibraltar Defendants never moved for summary judgment on this issue. Indeed, at the charge conference before the Court, counsel for the defendants agreed that the measure of damages under Section 12(2) was "a subject to be argued to the jury." Tr. 5389. This, we believe, is the proper view: how the parties defined "further consideration" under the option agreements was a question of fact for the jury. If the parties intended "further consideration" to include further advances by Mecca, in some amount to be determined by him, to Corona, then such further advances would properly be viewed as part of plaintiffs' obligations under the option agreements. *See, e.g.,* *Wall v. Wagner,* 125 F.Supp. 854, 858

---

4. As plaintiffs point out, the jury heard conflicting testimony on the value of the collateral. *See*

Tr. 2282–85 (Schwartz); 4361–63, 4381 (Friedman), 4451–53 (Mazzanti), 4638–39 (Brattebo).

(D.Neb.1954) (subsequent "equipment and completion" costs recoverable as consideration because required by the terms of the contract), *aff'd sub nom. Whittaker v. Wall,* 226 F.2d 868 (8th Cir.1955); *Koehler v. Pulvers,* 614 F.Supp. 829, 849 (S.D.Cal. 1985) ("In addition to the return of initial investments, defendants are liable for any subsequent capital assessments.").

Based on the record, the jury could have reasonably concluded that Mecca's promise to make funds subsequently available—even if the specific amounts were to be determined by him—was an element of the bargain without which Contreras would not have sold the options. There was evidence that all parties understood that Mecca's payment of funds in addition to the original $1.3 million would indeed occur. Specifically, Gibraltar, Schwartz, Contreras, Donald Addas, Mecca, and Mecca's representatives all realized that plaintiffs would inject further funds into Corona, and that the injections would cease only when Corona began to generate positive cash flow and emerged from Chapter 11. *See* Pltf. Mem. at 16–17. Without these infusions, Corona could not have been reorganized and the whole transaction would not make sense. Tr. 406–07, 914–17, 3062–63.

Consistent with this understanding, when the options were executed, Mecca had already commenced additional infusions—$235,000 at the closing—and advanced another $610,000 within 30 days. *See* Plaintiffs' Exhibit 196 (Greiner Aff. Exhibit 5). Thus, even though the literal terms of the option agreements provide that "Mecca will make funds available ... for the operations of Corona Plastics, Inc. in the Bankruptcy proceedings [in an amount] within the sole discretion of Mecca," Plaintiffs' Exhibits 33 & 34 (Greiner Aff. Exhibits 3 & 4), the evidence supported a finding that, in return for the options, plaintiffs provided twofold consideration, through the initial capital contribution and subsequent advances.

Against this background, the evidence supported the jury's award of $900,000 in damages. A chart introduced by plaintiffs showed a loss [5] of $1,436,010.71 as of October 19, 1985. *See* Plaintiffs' Exhibit 234A (Greiner Aff. Exhibit 10). The jury could have determined that plaintiffs could have recovered greater percentages on their collateral than those set forth on that chart, an issue that was the subject of conflicting testimony. Tr. 2282–85, 2299–307, 2309–12 (Schwartz); 4361–63, 4381 (Friedman); 4451–53 (Mazzanti); 4638–39 (Brattebo). In the alternative, the jury could have referred to Defendants' Exhibit HE (Greiner Aff. Exhibit 11), which showed damages of $927,241.09 as of the end of July 1985 and of $1,205,317.21 as of October 19, 1985.

■ Finally, the Gibraltar Defendants maintain that there was "no support whatsoever in the record evidence" for the jury's finding that they were 80% responsible for plaintiffs' injury and that Contreras was only 20% responsible. Gibraltar Defendants' Mem. at 38. Instead, the Gibraltar Defendants suggest, Contreras should have been held 100% liable. *Id.* at 41. The Gibraltar Defendants overlook the fact that the jury properly found them liable as control persons, who are equally liable with primary violators under the securities laws. Moreover, the jury's apportionment of damages is yet another indication to us that a key factor in the jury's deliberations was that they need not find reliance or causation under the Section 12(2) claims. The deciding factor was not, as the Gibraltar Defendants would have it, their "exoneration" on all charges of affirmative misconduct. As there was ample evidence in the record of the Gibraltar Defendants' control over Contreras and their role in the efforts to induce plaintiffs to invest in Corona, we will not disturb the jury's apportionment of damages.

Accordingly, the Gibraltar Defendants' motion for judgment notwithstanding the verdict is denied.

---

**5.** Plaintiffs' "loss", or damages, was calculated by subtracting the value of the collateral at a certain time from capital contributions made until that time. In other words, rather than simply receiving as damages all of his capital contributions, Mecca's contributions were to be offset by the value of the collateral as of the date on which the jury determined plaintiffs should have liquidated the collateral.

### B. *Contreras*

Although the grounds for Contreras's motion are difficult to discern, he appears to argue that 1) the Gibraltar Defendants should have been held liable as primary violators of the securities laws, rather than as control persons; 2) that plaintiffs did not rely on the defendants' misrepresentations; and 3) that the Gibraltar Defendants should have been held 100% liable for the damages.

 First, we have already determined, in ruling on the motion for summary judgment in this case, that the Gibraltar Defendants were not statutory sellers, and therefore could not be found primarily liable under Section 12(2). *Mecca v. Gibraltar*, No. 86 Civ. 5439, slip op. at 3–4 (KC) (S.D.N.Y. August 17, 1989) (memorandum endorsement). In any event, there was ample evidence in the record to support the jury's finding that Contreras violated Section 12(2). Second, it is not necessary for a plaintiff to prove reliance or causation under Section 12(2). Thus, whether or not plaintiffs relied on Contreras's misrepresentations and omissions is not relevant to the jury's finding Contreras liable under Section 12(2). Third, Contreras's contention that his contribution to the damages was too high is simply absurd, as the jury could reasonably have concluded that he was heavily involved in the defendants' efforts to fraudulently induce plaintiffs to invest in Corona.

Accordingly, Contreras's motion for judgment notwithstanding the verdict is denied.

## II. MOTIONS FOR A NEW TRIAL

In the alternative, both the Gibraltar Defendants and Contreras move for a new trial pursuant to Rule 59 of the Federal Rules of Civil Procedure. A trial court is empowered to grant a new trial to prevent a miscarriage of justice resulting from a jury verdict. *Katara v. D.E. Jones Commodities*, 835 F.2d at 970. The standard for granting a new trial is considerably less stringent than that applied on a motion for j.n.o.v. *Id.* Thus, the court may order a new trial if it believes that the verdict was against the weight of the evidence, *Ismail v. Cohen*, 712 F.Supp. 416, 419 (S.D.N.Y. 1989), although "a court may not substitute its own view for that of the jury's." *United States v. Burger*, 717 F.Supp. 245, 247 (S.D.N.Y.1989). A new trial may also be appropriate if evidence has been excluded or admitted improperly, to the prejudice of the moving party. *See, e.g., Marx & Co. v. Diners' Club, Inc.*, 550 F.2d 505 (2d Cir.), *cert. denied*, 434 U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977). Further, the giving of an erroneous jury instruction or the failure to give a proper requested instruction, if prejudicial, may also be a ground for a new trial. *See, e.g., Callen v. Pennsylvania R.R.*, 332 U.S. 625, 68 S.Ct. 296, 92 L.Ed. 242 (1948); *Bentley v. Stromberg–Carlson Corp.*, 638 F.2d 9 (2d Cir.1981). In general, however, the trial court should " 'abstain from interfering with the verdict unless it is quite clear that the jury has reached a seriously erroneous result.' " *Bevevino v. Saydjari*, 574 F.2d 676, 684 (2d Cir.1978) (quoting 6A J. Moore & J. Lucas, *Moore's Federal Practice* ¶ 59.08[5] at 59–161 (1973)).

Both the Gibraltar Defendants and Contreras argue that a new trial should be granted because 1) the verdict was against the weight of the evidence, 2) certain of the Court's evidentiary rulings were erroneous and prejudicial to the defendants, and 3) the Court's charges on control person liability and damages under Section 12(2) and 15 were erroneous and substantially prejudicial to the defendants. Contreras does not identify, however, which of the Court's rulings and jury instructions were erroneous and prejudicial to him. Because we simply cannot divine from the approximately 6,000–page trial record the asserted errors to which Contreras refers, we can consider only his argument that the verdict was against the weight of the evidence. We address the defendants' arguments in turn.

First, as to the defendants' contention that the verdict was against the weight of the evidence, the jury's verdict was, as we have discussed above, amply supported by the trial record. Accordingly, the defendants are no more entitled to a new trial

than they are to a judgment notwithstanding the verdict.

■ Second, as to the assertedly erroneous evidentiary rulings, the Gibraltar Defendants argue first that the Court erred in refusing to admit testimony concerning Schwartz's recounting to Friedman and Leonard Stowe his alleged statements to Benenson regarding the unauthorized movement of machinery to Mexico. As we determined at trial, after reviewing the oral arguments, Tr. 1455–56, 1668–70, 4118–34, and the Gibraltar Defendants' memorandum on the subject, the testimony concerning Schwartz's statements to Friedman and Stowe was inadmissible hearsay. Because there had been no charge of recent fabrication, which would have removed the statements from the hearsay rule, Tr. 4140; *see* Fed.R.Evid. 801(d)(1)(B), and because the statements lacked probative value and were redundant, Tr. 4141, 4144, the statements were properly excluded.[6]

■ The Gibraltar Defendants also argue that excerpts from Contreras's deposition in another proceeding, *In re Corona Plastics*, 99 B.R. 231 (Bankr.D.N.J.), were improperly received into evidence, even though the Court instructed the jury repeatedly that the excerpt was admissible only against Contreras.[7] One of the excerpts in question was Contreras's testimony that Schwartz told him that "I want to get out of the account because I didn't know about the machines being moved, whether or not I have a big exposure there, and of course on the pro forma invoicing," Tr. 4212, testimony which conflicted with Schwartz's and Friedman's. Indeed, the excerpt was read into evidence during Friedman's testimony, which timing, Gibraltar Defendants claim, exacerbated the prejudicial impact.

The Gibraltar Defendants contend that the excerpts should have been excluded because they were relevant only to plaintiff's case against them, and not Contreras. Obviously Contreras's testimony was relevant to his involvement in the scheme to induce Mecca to invest in Corona. Even assuming *arguendo* that the excerpts were not relevant to the Gibraltar Defendants, the Gibraltar Defendants suffered no harm because the jury was instructed not to consider the excerpts with respect to the Gibraltar Defendants. We assume, as we must, that the jury heeded the Court's cautionary instructions. *See United States v. DeLillo*, 620 F.2d 939, 947 (2d Cir.), *cert. denied*, 449 U.S. 835, 101 S.Ct. 108, 66 L.Ed.2d 41 (1980); *United States v. Levy*, 578 F.2d 896, 900 (2d Cir.1978); *Lifetime Siding, Inc. v. United States*, 359 F.2d 657, 661 (2d Cir.), *cert. denied*, 385 U.S. 921, 87 S.Ct. 233, 17 L.Ed.2d 144 (1966).

■ The Gibraltar Defendants further object to the Court's allowing the plaintiffs to pose certain questions to Contreras when he was called as a witness at the trial, even though he had previously stipulated that he would assert his Fifth Amendment privilege if called to testify. The questions put to Contreras had a good faith basis and were appropriate, as they were relevant to Contreras's role in inducing Mecca to invest in Corona. Moreover, the Court again instructed the jury that any inferences they drew from Contreras's invoking the Fifth Amendment could be drawn only against Contreras, not the Gibraltar Defendants.

■ Third, the Gibraltar Defendants move for a new trial on the ground that the Court's charges on control person liability and damages under Section 12(2) and 15 were erroneous and substantially prejudicial to them. As to the charge on control person liability, the Gibraltar Defendants argue that the Court improperly placed the burden of proving lack of knowledge on the defendants, rather than requiring the plaintiffs to prove knowledge as part of their

---

**6.** The Gibraltar Defendants complain that the exclusion of Schwartz's statements to Friedman and Stowe was especially prejudicial to the Gibraltar Defendants because counsel for the plaintiffs, in his summation, highlighted the absence of testimony corroborating Schwartz's version of his conversation with Benenson. Of course, the Gibraltar Defendants' counsel opened the door for this prejudicial effect by referring to Schwartz's statements to Friedman and Stowe in his opening, despite the risk that the statements would be excluded as hearsay.

**7.** The plaintiffs argued that the excerpt was admissible against the Gibraltar Defendants under Federal Rule of Evidence 804(b)(3).

348

Section 15 claim.[8] Courts have divided on the issue of whether a plaintiff must prove knowledge. *Compare Index Fund v. Hagopian*, 609 F.Supp. 499, 511 (S.D.N.Y. 1985) ("[T]hree elements must be proved in order to establish [controlling person] liability: (1) a primary violation, (2) scienter, and (3) control of the primary violator by the defendant"); *O'Connor & Associates v. Dean Witter Reynolds, Inc.*, 529 F.Supp. 1179, 1194–95 (S.D.N.Y.1981) *with Polycast Technology Corporation v. Uniroyal, Inc.*, [1988–1989 Transfer Binder] Fed.Sec. L.Rep. (CCH) ¶ 94,005, at 90,695–96 (S.D. N.Y. August 25, 1988) ("plaintiff need not plead scienter when alleging controlling person liability") (collecting cases); *Drobbin v. Nicolet Instrument Corp.*, 631 F.Supp. 860, 885 (S.D.N.Y.1986) ("To the extent that there is any scienter requirement for [controlling person] liability, it arises only in the context of [the good faith] statutory defense"); *Savino, Inc. v. E.F. Hutton & Co.*, 507 F.Supp. 1225, 1243 & n. 21 (S.D.N.Y.1981) ("[I]t is plain to the Court that the plaintiff need only allege control by status in order to state a claim under Section 20(a)").

Courts holding that a plaintiff must plead and prove scienter have relied primarily on *Lanza v. Drexel & Co.*, 479 F.2d 1277 (2d Cir.1973) (en banc), which refers to control persons as those "who are in some meaningful sense culpable participants in the fraud perpetrated by controlled persons." *Id.* at 1299. This reference does not expressly indicate however, which side should bear the burden of proving "culpable participation." Based on our reading of the statutory language and of *Marbury Management, Inc. v. Kohn*, 629 F.2d 705, 716 (2d Cir.), *cert. denied*, 449 U.S. 1011, 101 S.Ct. 566, 66 L.Ed.2d 469 (1980), we concluded that the burden should be placed on the defendants, and so charged the jury. We now adhere to this view.

As to the charge on damages under Section 12(2), the Gibraltar Defendants argue that the charge was improper because it provided for consequential damages. Strictly speaking consequential damages are not permitted under the explicit language of Section 12(2), which limits a plaintiff to rescissory damages unless he no longer owns the security. *See Randall v. Loftsgaarden*, 478 U.S. 647, 655, 106 S.Ct. 3143, 3149, 92 L.Ed.2d 525 (1986); *Wigand v. Flo–Tek, Inc.*, 609 F.2d 1028, 1035 (2d Cir.1979). Under a rescissory measure of damages, "the plaintiff is entitled to a return of the consideration paid, reduced by the amount realized when he sold the security and by any 'income received' on the security." *Randall v. Loftsgaarden*, 478 U.S. at 656, 106 S.Ct. at 3149. Thus, rescissory damages do not include consequential damages, that is, out-of-pocket losses. The use of the term "consequential" may therefore have been improper, in the sense that plaintiffs were not entitled to out-of-pocket losses.

Nevertheless, the charge on damages was not erroneous or prejudicial, for "consequential damages" in the context of the charge did not refer to out-of-pocket losses. Rather, the term, as is clear from the charge when read as a whole, referred to the consideration plaintiffs advanced to Corona subsequent to the initial $1.3 million. Because rescission was not possible in this case, plaintiffs' theory of damages was that plaintiffs could recover the consideration paid for the options, reduced by the amount plaintiffs would have realized had they liquidated the collateral when they discovered, or should have discovered, the fraud, that is, when Mecca should have repudiated the option agreements and stopped infusing Corona with capital. As we have discussed, see *supra* at 344–45, the jury could properly have concluded that

**8.** Section 15 provides that

> Every person who, by or through stock ownership, agency or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under section 77k or 77*l* of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, *unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.*
>
> 15 U.S.C. § 77*o* (emphasis added).

the consideration plaintiffs paid for the options included advances of capital in addition to the initial $1.3 million. Thus, in the words of plaintiffs' counsel, damages were to be calculated by determining "what [plaintiffs] put in less the collateral on whatever day the jury finds that [plaintiffs] should have gotten out of this deal." Tr. 5385.

Accordingly, the Court charged the jury that it could "consider the sums that the plaintiffs advanced to Corona ... to the extent that these investments in Corona were justifiable at the time that they were made." Tr. 5786. The Court further charged the jury that

> If you find that the plaintiffs' investments in Corona remained justifiable through February 2, 1989, then you should calculate consequential damages by subtracting the value of Jerhel as of that date from the amount the plaintiffs had invested in Corona. If, on the other hand, you find that the plaintiffs' continuing investment in Corona ceased to be justifiable at some time before February 2, 1989, then you should calculate consequential damages by determining how much money the plaintiffs would have lost had they decided to liquidate their investment on that earlier date.

Tr. 5786. Under the facts and circumstances of the case, this charge was not erroneous, and, to the extent that the use of the term "consequential" was inaccurate, it was not prejudicial.

█ The Gibraltar Defendants also contend that the Court should have instructed the jury that the plaintiffs could recover no damages under Section 12(2). Again, as we have discussed, see *supra* at 344–45, the jury was entitled to treat plaintiffs' capital advances to Corona in addition to the initial $1.3 million as part of plaintiffs' consideration. Accordingly, plaintiffs were entitled to damages under Section 12(2).

Finding no errors which resulted in a miscarriage of justice, we deny defendants' motions for a new trial.

## III. MOTION FOR PREJUDGMENT INTEREST

█ Finally, we address plaintiffs' motion for prejudgment interest. Plaintiffs seek $373,709.59 in prejudgment interest, based on their assumption that the jury awarded damages as of October 19, 1985, that is, that the jury selected October 19, 1985 as the date on which plaintiffs should have liquidated the collateral and advanced no more capital to Corona. An award of prejudgment interest on federal securities law claims is within the discretion of the trial court. *See Manufacturers Hanover Trust Co. v. Drysdale Sec. Corp.*, 801 F.2d 13, 28 (2d Cir.1986) (citing *Blau v. Lehman*, 368 U.S. 403, 414, 82 S.Ct. 451, 457, 7 L.Ed.2d 403 (1962)), *cert. denied*, 479 U.S. 1066, 107 S.Ct. 952, 93 L.Ed.2d 1001 (1987). Thus, while the purpose of an interest award is compensatory, the Supreme Court has noted that "interest is not recovered according to a rigid theory of compensation for money withheld, but is given in response to considerations of fairness. It is denied when its exaction would be inequitable." *Board of Comm'rs v. United States*, 308 U.S. 343, 352, 60 S.Ct. 285, 289, 84 L.Ed. 313 (1939), *quoted in Blau v. Lehman*, 368 U.S. 403, 414, 82 S.Ct. 451, 457, 7 L.Ed.2d 403 (1962) *and Osterneck v. Ernst & Whinney*, 489 U.S. 169, 176, 109 S.Ct. 987, 991, 103 L.Ed.2d 146 (1989). Among the factors a court must consider are "[i] whether prejudgment interest is necessary to compensate the plaintiff fully for its injuries, [ii] the degree of personal wrongdoing on the part of the defendant, [iii] the availability of alternative investment opportunities to the plaintiff, [iv] whether the plaintiff delayed in bringing or prosecuting the action, and [v] other fundamental considerations of fairness." *Osterneck*, 109 S.Ct. at 991 (citing *Norte & Co. v. Huffines*, 416 F.2d 1189, 1191–92 (2d Cir.1969), *cert. denied*, 397 U.S. 989, 90 S.Ct. 1121, 25 L.Ed.2d 396 (1970)).

We believe an award of prejudgment interest is not warranted in this case. First, as to whether the plaintiffs have been fully compensated for their injuries, we note that, in addition to the $900,000 in damages, plaintiffs now own Jerhel Plastics, a profitable company which should continue to be profitable. Second, as to the degree of personal wrongdoing on the part of the

defendants, we observe that, although there was evidence of fraudulent conduct by the defendants, the jury held them liable only under Section 12(2), the only claim requiring no reliance or causation. Thus, the jury apparently concluded that the plaintiffs had not relied on defendants' misrepresentations and/or that defendants had not caused plaintiffs' losses. Moreover, defendants were exonerated on the charges of racketeering, which were extremely thin, after having lived under the stigma of those charges for years. Accordingly, considerations of fundamental fairness, along with the other *Osterneck* factors, dictate against an award of prejudgment interest to the plaintiffs.[9]

## CONCLUSION

Defendants' motions for judgment notwithstanding the verdict, or in the alternative, for a new trial, are denied. Plaintiffs' motion for an award of prejudgment interest is also denied.

SO ORDERED.

9. Because we conclude that an award of prejudgment interest is not warranted, we need not address the Gibraltar Defendants' arguments that (i) the jury's damage award included prejudgment interest at least prior to February 2, 1989, and (ii) any award of prejudgment interest must be reduced by any tax benefits received by plaintiffs as a result of their loss. Nevertheless, it appears that plaintiffs have the better of the argument on both points.