**BYRLEY, Appellant,**

v.

**NATIONWIDE LIFE INSURANCE COMPANY et al., Appellees.**

[Cite as *Byrley v. Nationwide Life Ins. Co.* (1994), 94 Ohio App.3d 1.]

Court of Appeals of Ohio,
Erie County.

No. E–92–41.

Decided March 4, 1994.

2

4

*James E. McGookey,* for appellant.

*James A. Laurenson* and *Robert J. Hanna*, for appellees.

HANDWORK, Judge.

This case is on appeal from the August 14, 1992 judgment of the Erie County Court of Common Pleas, which entered judgment in favor of appellees, Nationwide Life Insurance Company, Nationwide Investing Foundation, Nationwide Financial Services, Inc., Nationwide Investors Services, Inc., Spiegelburg Insurance Agency, Inc., and Dale W. Spiegelburg. On appeal, appellant, Teri Moser Byrley, asserts the following assignments of error:

"I. Assignment of Error No. 1: The court erred in excluding all evidence regarding the second attempt of Spiegelburg to convince plaintiff to move her money.

"II. Assignment of Error No. 2: The verdict was against the manifest weight of the evidence."

Appellees assert the following cross-assignments of error to support the trial court's judgment:

"1. The trial court should have granted defendants' motions for summary judgment and for directed verdict.

"2. The trial court should not have charged the jury on punitive damages where the evidence failed to show hatred, ill will, or a spirit of revenge."

All of the causes of action asserted against the defendants in this case involve financial advice and transactions occurring between the summer of 1984 and the fall of 1987. Pertinent to this appeal are the following claims for relief asserted against all of the defendants: (1) that the defendants breached their fiduciary relationship with Byrley when they gave financial investment advice to her; (2) that the defendants fraudulently gave Byrley financial advice; (3) that the defendants fraudulently concealed information regarding financial investments; (4) that defendants' actions constitute churning because they induced her to transfer funds between investments solely for the purpose of gaining commissions; (5) through (8) that the defendants violated Sections 12(2) and 17(a) of the Securities Act of 1933, R.C. 1707.41, and Sections 1 through 4 of the Rules of Fair Practice of the National Association of Security Dealers and of the Policies of the Board of Governors; (9) that the defendants gave financial advice negligently; (10) that the defendants breached their contractual obligations owed to Byrley; and (11) that the defendants' actions constitute bad faith and deliberate misconduct.

Following a trial by jury, judgment was rendered in favor of the defendants on all counts. At trial, the following evidence was presented by Byrley.

Following her husband's death in 1984, Byrley consulted with Wayne Haywood, a sales manager for Nationwide Insurance Company, regarding the investment of the funds she received as a result of her husband's death. Byrley's husband had worked with Haywood, and Byrley trusted his advice. Haywood recommended that the money be invested in Nationwide's Multi–Flex Annuity. This annuity was established in October 1981 by Nationwide Financial Services, Inc. The annuity allowed money to be invested in a fixed-return fund or three variable funds (a common stock fund, a government bond fund, or a money market fund). A yearly 1.3 percent mortality and management fee was charged by Nationwide Insurance Company for managing the annuity. Money could be shifted between these funds at any time without charge. In Haywood's opinion, however, there was a restriction on the amount of money which could be shifted each quarter.

Haywood chose this annuity over Nationwide Insurance Company's mutual funds because the income from the annuity was tax deferred, the sales charge diminished to zero if the funds remained in the annuity for eight years and, upon Byrley's death, the funds would pass directly to a named beneficiary and avoid her probate estate. Byrley agreed to the investment because she understood it to be a safe, conservative investment which would give her a fixed rate of return.

Because Haywood could not sell Byrley the investment, he directed one of his salespersons, Dale Spiegelburg, to do so. Both Haywood and Spiegelburg received a commission on the sale.

In November 1986, Haywood wrote to Byrley to suggest that she move her money out of the fixed fund and into the variable funds of the annuity to obtain a better return on her investment. Byrley had discussed with Haywood the need to increase her rate of return. Haywood did not consider moving Byrley's money out of the annuity. When he heard that she was moving the money to mutual funds, he briefly compared the investments and found that the mutual funds had earned more than the annuity over the last five years.

The testimony regarding the events after this time is contradicted. Spiegelburg testified as follows. He met with Byrley for the first time on November 25, 1986, at her home. Before that meeting, Byrley had called Spiegelburg and indicated that she was unhappy with the return she was earning in the annuity's fixed fund (approximately six and one-half percent annual average yield) and asked about an alternate investment. She told him that she wanted to invest the money for her ten-year-old son's college education. Spiegelburg believed that Byrley had decided to move her money to another investment and he hoped to keep the money within his agency. They discussed moving the money into the variable funds of the annuity to obtain a higher yield, but dismissed the idea because of the risk of loss in such funds. Spiegelburg suggested Nationwide Investing Foundation's NIF fund (a stock fund) and a corporate bond fund

established by Nationwide Financial Services, Inc., because they were more secure, had a higher-yield potential, and were more liquid.

Spielburg prepared a comparison of the annuity and other investments for Byrley. The comparison indicated that a deferred sales charge of $8,100 and an administration fee of $30 would be deducted from the money withdrawn from the annuity. Spiegelburg did not receive any of the sales charge as a commission. In addition, the comparison indicated that a three-percent sales charge ($6,316.50) would be assessed to move the money into the NIF fund and the Nationwide bond fund (hereinafter the "mutual funds"). Byrley was told that it would take two years to recoup the cost of moving the money to this new investment if future performance tracked past performance.

Spiegelburg prepared his comparison based upon the performance of the mutual funds in 1985. Spiegelburg did not use performance information regarding early years because he knew that the mutual funds were outperforming the annuity. The annuity had only been in existence for five and one-half years, yet Spiegelburg did not indicate the average yield for those years. Byrley was not given long-term comparisons between the investments. At this meeting, Spiegelburg also compared the safety issues between the two types of investments. Spiegelburg testified that he left with Byrley the prospectus for the mutual funds. The prospectus indicated the average yield for the prior year, three years, five years, and ten years. It indicated a ten-year average of 12.1 percent. Spiegelburg testified that a reasonable expected yield for the mutual funds would be ten-to-twelve percent.

Because of the consequences of moving her money, Spiegelburg advised Byrley to seek other advice for matters such as the tax consequences. They discussed the tax issue briefly and Byrley indicated that she had a low income and would rather pay taxes as her income was earned.

Sometime that day, Byrley executed a redemption slip to authorize the withdrawal of her money from the Multi–Flex Annuity. Spiegelburg could not recall when the slip was signed, but knew it was not done in his presence. A replacement slip was signed on November 28, 1986, because Byrley's signature on the first slip had not been guaranteed. After Spiegelburg received the proceeds from the annuity fund, he called Byrley to have her come to the office to complete an application to reinvest the money. Byrley had requested that the money be sent to the office rather than her home.

At the next meeting on December 6, 1986, Byrley signed the necessary forms to invest the money in the mutual funds: $105,397 was invested in the NIF fund, and $105,397 was invested in the Nationwide bond fund. Before the applications were completed, Spiegelburg discussed with Byrley and her current husband the consequences of the sales charges and the performance comparison.

Byrley testified regarding the same events, but stated that Spiegelburg had called her in November 1986, telling her that he was going to handle her insurance needs. He told her that he had an investment to show her that would earn more money than her annuity. When he came to her home, she told him that she did not understand the points he was making except that she would make more money. She could recall only that the comparison and Spiegelburg himself emphasized the three and one-half percent difference between the earnings on the mutual funds versus the annuity. She could not remember having a prospectus for the mutual funds given to her at that meeting. She also did not recall deciding that day to liquidate the annuity. However, she did acknowledge her signature on the redemption slip.

They set up another meeting in Spiegelburg's office, which Byrley's second husband attended. At the meeting, Spiegelburg showed them his comparison between the two investments. She questioned the sales charge, but was assured that the loss would be covered by the increased income. She also testified that Spiegelburg explained that the new investment required taxes to be paid up front. She did not fully understand this and was never advised to seek tax advice. She also testified, however, that she understood that the mutual funds would be more liquid and that the taxes on the earned income would have to be paid as it was earned. However, she stated that liquidity was not one of her investment goals. She stated that she made the change because she trusted Spiegelburg's advice. Spiegelburg did not warn her, however, that they would also pay $3,651 in additional taxes because of the transfer to another investment.

Byrley testified that she could not have met with Spiegelburg after November 28, 1986, because she moved into a hotel in Akron on November 30 so that she could be near the hospital where she would deliver her child. When Spiegelburg received the check representing the withdrawal of the funds from the annuity, he sent his son to the hotel with the necessary forms for her to sign to reinvest the money.

David Byrley, Byrley's second husband, testified that near the end of November 1986, Spiegelburg discussed moving Byrley's money out of the Multi–Flex Annuity and into the mutual funds. Spiegelburg told them that they could recoup the cost of moving the money by the increase in returns. Spiegelburg had also suggested to them that it would be better to pay their taxes on their income now because their income was low. David Byrley did not recall Spiegelburg's telling them to seek tax advice. David Byrley also testified that it was not until a meeting on November 28, 1986, which he himself attended, that Spiegelburg presented a comparison between the Multi–Flex Annuity and the mutual funds using the balance as of November 26, 1986, for the annuity fund. After the meeting, Byrley decided to move her money into the mutual funds because of

Spiegelburg's advice. David Byrley also testified that they paid additional taxes because the money was withdrawn from the Multi–Flex Annuity.

In 1987, Byrley contacted Spiegelburg regarding the falling bond market. Her husband had suggested that she call Spiegelburg to obtain his recommendation. Spiegelburg recommended to her that she not move the money, but leave it there for the long run. He indicated that the two funds would stabilize her return. Initially, Byrley decided to move all of the money out of the bond fund and into the common stock fund. Spiegelburg started to comply with her request. There was no sales charge for this type of transaction. Byrley called again the next day and canceled her decision to shift the funds. In October 1987, Byrley again called Spiegelburg because of the stock market decline.

She asked for Spiegelburg's advice, and he recommended that she not sell her investment in the mutual funds because he intended for it to be a long-term investment. Byrley was critical of Spiegelburg's services because he did not call her when the bond market or the stock market fell. Byrley was never happy with the mutual fund investment because the market was always rising and falling.

James Pierson, a manager of sales training and promotion for Nationwide Financial Services, Inc. from September 1985 until April 1988, testified. Part of Pierson's duties included training salespersons to sell mutual funds and training them in basic selling techniques. He described the Multi–Flex Annuity as an investment designed for investors who wanted to safeguard their money, put money away for a longer period of time without concern about liquidity, and defer tax liability. He believed that the government bond fund in the annuity is similar to the Nationwide bond fund, only more conservative. He also believed that the common stock fund of the annuity is very similar to the Nationwide growth fund. Both funds are managed by the same person and have the same objectives of long-term appreciation. He believed that the NIF fund is more conservative than the Nationwide growth fund because it involves investing in the stock of more well-established companies.

Pierson testified that an agent's sales commission for the sale of a mutual fund varied based upon the amount of money invested in the mutual fund. The agent received one half of the sales charge. He believed that the sale of mutual funds is a very small percentage of an agent's income—less than two-to-five percent. Pierson had initiated sales promotion contests because he needed to push agents to sell products other than basic life insurance.

In his opinion, an investor could decide to transfer all of their money from the Multi–Flex Annuity earlier than planned if their objectives had changed and they wanted more liquidity.

Spiegelburg testified that in 1986 he participated in a sales contest regarding the sale of mutual funds. At the time that he sold Byrley the mutual funds, he was second in the country in mutual funds sales. He had made $542,000 in sales by October 1986. At the end of the year, he had made $1,647,536 in sales. He received $6,000 of travel vouchers for being in second place at the end of the year. Spiegelburg testified that these sales were generated through his existing client base.

Byrley sold her shares in the mutual funds and closed her account on December 28, 1988. She had purchased the mutual fund shares with $210,000 and closed her account for $219,000.

Leland Welty, a CPA, testified that he compared Byrley's earnings gained in the mutual funds with hypothetical earnings at a ten-percent simple interest rate for the same period. Welty also took into consideration withdrawals made by Byrley during that same time period. He concluded that Byrley lost $34,281.40 by investing in the mutual funds versus an investment which would have yielded a ten-percent simple interest rate return.

James Newdick, a financial planner, testified that it was inappropriate for Spiegelburg to give financial advice comparing investments based solely upon one year's performance, to omit to provide information regarding tax consequences of an investment, and to fail to give information on other types of mutual funds available. Newdick also indicated that the movement of Byrley's money from the annuity to the mutual funds was not sound financial advice and was improper. He believed that Spiegelburg's advice was commission-motivated. Newdick also believed that the initial investment in the annuity was bad advice because the money should have been more diversified. Although Newdick believed that the withdrawal from the annuity could have resulted in a tax penalty, he testified that such a tax penalty was neither assessed nor paid.

In her first assignment of error, appellant argues that the trial court erred by refusing to admit into evidence testimony or other evidence relating to investment advice given by Spiegelburg to Byrley in April 1988. At trial, Byrley proffered that this evidence consisted of Spiegelburg's testimony that he prepared, in March or April 1988, a performance projection to indicate what the return would be on Byrley's money if she would switch investments to an investment life or variable life product. This projection was allegedly prepared prior to Byrley's request. Byrley intended to show that this proposed investment was similar to the Multi–Flex Annuity in which Byrley had originally invested her money. Byrley intended to use such evidence to prove that Spiegelburg's testimony regarding the reasons for his November 1986 financial advice (safety, liquidity, and growth) was not credible, since he recommended in March or April 1988 that Byrley reinvest her money in a product similar to what she had

originally started with. Byrley believed that this evidence was relevant with respect to the liability issues as well as the punitive damages issue.

Appellees opposed introduction of the evidence. Prior to trial, appellees had moved to exclude from evidence the proposed financial transaction in April 1988 on the ground that such evidence was irrelevant and immaterial. Appellees argued that because this contemplated financial transaction was not completed, and appellant suffered no losses, it is irrelevant as to the causes of action arising from events occurring from the summer of 1984 through the fall of 1987. Appellees argued, alternatively, that such evidence, if relevant, was also not admissible because its probative value would be substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading of the jury, and would delay resolution of the issues. Appellees also argued that the jury would be prejudiced because reference to another transaction would falsely suggest an additional cause of action and more damages. Furthermore, appellees argued that they would be required to defend against a collateral "suggested" claim arising from the April 1988 events. Appellees reiterated the same grounds at the trial for excluding this evidence.

■ Appellees also attempt on appeal to argue that this evidence is inadmissible under Evid.R. 403(B). Appellees did not raise this issue before the trial court and we will not consider it on appeal. *Stores Realty Co. v. Cleveland* (1975), 41 Ohio St.2d 41, 43, 70 O.O.2d 123, 124, 322 N.E.2d 629, 630–631, and Evid.R. 103(A)(1).

■ Determinations regarding the admissibility of relevant evidence are left to the discretion of the trial court. *Rigby v. Lake Cty.* (1991), 58 Ohio St.3d 269, 271, 569 N.E.2d 1056, 1058. Therefore, such determinations will not be reversed on appeal unless a party can show that the trial court abused its discretion and the party was materially prejudiced. *Krischbaum v. Dillon* (1991), 58 Ohio St.3d 58, 66, 567 N.E.2d 1291, 1298–1299. An abuse of discretion involves "more than an error of law; it implies that the court acted unreasonably, arbitrarily or unconscionably." *Rigby v. Lake Cty.*, 58 Ohio St.3d at 271, 569 N.E.2d at 1058.

Evid.R. 401 defines "relevant evidence" as "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

Even relevant evidence, however, may be excluded. Evid.R. 403, which sets forth the grounds for the exclusion of relevant evidence, reads as follows:

"(A) *Exclusion mandatory.* Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury.

"(B) *Exclusion discretionary.* Although relevant, evidence may be excluded if its probative value is substantially outweighed by considerations of undue delay, or needless presentation of cumulative evidence."

In the case before us, any evidence which indicates that Spiegelburg advised Byrley to move her money back into an investment similar to the Multi–Flex Annuity less than two years after she had moved the money into the mutual fund is clearly relevant to Spiegelburg's motive for advising Byrley in 1986 to move into the mutual funds, as well as his credibility at trial. Spiegelburg's motive or intent is a material element in all of the causes of action against him. This evidence is relevant even though Byrley never acted upon Spiegelburg's advice and never suffered damages as a result.

Appellees contend that the April 1988 advice is too remote in time from the events of November 1986 and that too many other events had occurred to justify Spiegelburg's advice in 1988. We find that such an argument is without merit. The fact that a new investment was suggested (less than two years after Spiegelburg told Byrley that it would take two years to recoup the sales charges resulting from the transfer of her money into the mutual funds) would allow a factfinder to conclude that Byrley's money was being transferred for some motive other than her best interest. A span of sixteen months was not too remote in time under the facts of this case. Any events which occurred since the November 1986 advice could easily be presented by appellees (as was done in their appellate brief) to justify Spiegelburg's April 1988 advice.

Appellees argue alternately that this evidence, if relevant, should be excluded because the jury would be too confused by additional testimony regarding Spiegelburg's basis for the April 1988 advice. We do not agree that this additional testimony by Spiegelburg would be so involved that it would cause a "mini-trial" of the issue.

■ The trial court, however, excluded this evidence solely because it also excluded appellees' evidence regarding the performance of the mutual fund after December 8, 1986 (the date on which it was sold). The trial court found this evidence to be irrelevant. That ruling has not been appealed by appellees. To exclude relevant evidence solely because irrelevant evidence was excluded is unreasonable.

■ Appellees also argue that even if the trial court's evidentiary ruling was erroneous, appellant was not prejudiced by it. We disagree. The exclusion of probative evidence of this nature is prejudicial.

We hold, therefore, that the trial court abused its discretion by excluding appellant's evidence regarding the April 1988 advice. Appellant's first assignment of error is well taken.

In her second assignment of error, appellant argues that the jury's finding that appellees did not violate Ohio securities law was contrary to the manifest weight of the evidence. Since we have found appellant's first assignment of error well taken, and a new trial must occur, appellant's second assignment of error is rendered moot and will not be considered at this time.

■ Appellant contends that we do not have jurisdiction to address appellees' cross-assignments of error because they did not file a cross-notice of appeal. Under the circumstances of this case, appellees did not need to file a cross-appeal to assert their cross-assignments of error. Such a notice is not required when a party intends only to assert cross-assignments of error to defend a judgment based on grounds other than those grounds the trial court relied upon to render its decision. App.R. 3(C)(2).

■ In their first cross-assignment of error, appellees argue that judgment should have been rendered in their favor on either their motion for summary judgment or their motion for a directed verdict.

Summary judgment is appropriate when "the pleading, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence in the pending case, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. No evidence or stipulation may be considered except as stated in this rule. A summary judgment shall not be rendered unless it appears from such evidence or stipulation and only therefrom, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, such party being entitled to have the evidence or stipulation construed most strongly in his favor." Civ.R. 56(C).

First, appellees argued in their motion for summary judgment that appellant has no proof of damages because she sold the mutual fund shares for approximately $9,000 more than she paid for them. In her response to appellees' motion for summary judgment, Byrley identified depositional evidence to support her contention that her damages included $14,416.50 in commissions and fees and an additional $8,837.06, which represented lost income. In addition, she also presented evidence that she paid additional taxes by withdrawing money from the Multi–Flex Annuity. We find that this evidence was sufficient to raise a genuine issue of material fact and defeat summary judgment on this issue.

Appellees argued in their motion for summary judgment that Byrley could not prove her first claim, breach of fiduciary duty, because she failed to identify the duty allegedly breached. In response, Byrley argued that Spiegelburg breached his fiduciary duty to advise Byrley regarding financial investments for purposes

of her best interest and not his own profit. Byrley also asserted that Spiegelburg breached his fiduciary duty by omitting or misstating material facts regarding the comparisons between the investments. To support her claims, Byrley points to the depositional testimony of Newdick, who testified that Spiegelburg's advice was commission-motivated. This evidence was sufficient to raise a genuine issue of material fact as to this issue and defeat summary judgment on the breach of fiduciary duty claim.

Appellees next argued in their motion for summary judgment that appellant could not prove her second and third claims for fraud. They asserted that appellant cannot prove any fraudulent representation or concealment of a material fact because she was provided with a prospectus and her expert witness, Newdick, testified at his deposition that no fraud occurred. In response, Byrley argued that she could prove that Spiegelburg used a misleading and incomplete comparison of the alternative investments and told her that she would benefit from the move. To support her claim, appellant points to the depositional testimony of her expert, Newdick, who testified that Spiegelburg should have known that his advice was not in appellant's best interest, that he omitted material information regarding the comparison of the investments, and that his advice was commission-motivated. Newdick's statement that these representations were not fraudulent is merely a legal conclusion which he is not competent to make. Appellant's evidence was sufficient to raise a genuine issue of material fact and defeat summary judgment regarding these claims.

■ Appellees also argued in their motion for summary judgment that the court could not consider appellant's fourth claim, churning, because the court lacks jurisdiction over alleged violations of the fraud sections of the Securities Exchange Act of 1934 (Section 10[b] and Section 10[b][5] ).

It is not entirely clear as to what cause of action appellant is asserting with regard to her "churning" claim. In her amended complaint, she alleged "churning" but did not indicate that a violation of a securities law occurred. In her memorandum in opposition to the motion for summary judgment, she asserted that "churning" is a form of securities fraud and a breach of the advisor's fiduciary duties.

The federal courts have exclusive jurisdiction over securities fraud claims arising under Sections 10(b) and 10(b)(5) of the Securities Exchange Act of 1934. Section 78aa, Title 15, U.S.Code, and *Clark v. Watchie* (C.A.9, 1975), 513 F.2d 994, 997, certiorari denied (1975), 423 U.S. 841, 96 S.Ct. 72, 46 L.Ed.2d 60. Therefore, the trial court had no jurisdiction to consider this aspect of appellant's "churning" claim. If appellant intended to assert that "churning" constitutes a breach of the broker's fiduciary duties, that issue is covered in her first claim for

relief for breach of fiduciary duty. Therefore, we conclude that the trial court should have dismissed appellant's fourth cause of action.

Appellees next argued in their motion for summary judgment that appellant cannot prove her fifth, sixth, seventh, and eighth causes of action.

■ First, appellees argued that appellant cannot prove a violation of Section 12(2) of the Securities Act of 1933. Appellees argued that Nationwide Insurance Company, Nationwide Investing Foundation, and Nationwide Investors Service, Inc. are not "sellers" under the Act and therefore cannot be subject to liability.

Section 12(2) of the Securities Act of 1933 provides that:

"Any person who—

"(1) offers or sells a security in violation of section 5 [Section 77e, Title 15, U.S.Code], or

"(2) offers or sells a security (whether or not exempted by the provisions of section 3 [Section 77c, Title 15, U.S.Code], other than paragraph (2) of subsection (a) thereof), by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission

"shall be liable to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security."

■ The terms "offeror" or "seller" have been defined at a minimum to include anyone in a buyer-seller relationship akin to traditional contractual privity. Thus, the terms include anyone who passes title to the security to the buyer for value. *Pinter v. Dahl* (1988), 486 U.S. 622, 642, 108 S.Ct. 2063, 2076, 100 L.Ed.2d 658, 679. It also includes a broker who successfully solicits the purchase as an agent for his principal. *Id.* at 646, 108 S.Ct. at 2078, 100 L.Ed.2d at 681–682. Traditional agency principles also apply to hold brokerage firms liable for the illegal acts of their brokers/employees in the sale of securities. *Holloway v. Howerdd* (C.A.6, 1976), 536 F.2d 690, 694–695.

Sufficient evidence was presented to raise an issue of material fact as to whether Spiegelburg was acting as an agent of Nationwide Insurance Company,

Nationwide Investing Foundation, and Nationwide Investors Service, Inc. in selling the mutual funds to appellant. Therefore, the trial court properly denied summary judgment on this issue.

Alternatively, appellees argue that there is no evidence of an untrue statement or omission of a material fact in a prospectus or by oral communication.

We disagree. There is depositional evidence which indicates that Spiegelburg orally explained his comparison of the two investments and omitted certain information regarding the prior yield of the Multi–Flex Annuity Variable Fund. In addition, there is evidence that Spiegelburg omitted information regarding the tax consequences of changing investments. This evidence is sufficient to raise a genuine issue of material fact and defeat summary judgment.

Second, appellees argued that appellant cannot recover under Section 17(a) of the Securities Act of 1933 because that section does not provide for a private cause of action. While some courts hold that this section does not provide for a private cause of action, the Sixth Circuit has allowed such a private cause of action for purchasers of securities. *Craighead v. E.F. Hutton & Co., Inc.* (C.A. 6, 1990), 899 F.2d 485, 492. Therefore, we find that the trial court properly denied summary judgment to appellees on this basis.

Third, appellees argued in their motion for summary judgment that appellant has no proof of a violation of R.C. 1707.41 because she cannot prove reliance on an untrue statement or omission and she cannot prove that she lost money because of any falsity of any material statement. Appellant argues that Spiegelburg's written recommendation to her omitted material facts regarding past performance of the mutual funds and tax penalties that would be incurred if the money was withdrawn from the annuity. Appellant also argues that Spiegelburg falsely represented to her that there were valid reasons for moving her money. Appellant testified that she relied upon Spiegelburg's advice to change her investment. Welty testified that Byrley lost approximately $34,000 in income by investing in the mutual funds. Appellant also testified that she paid commissions to withdraw her funds from the annuity and to invest in the mutual funds. This evidence is sufficient to raise a genuine issue of material fact as to whether the statute was violated and to avoid summary judgment on this issue.

Fourth, appellees argued in their motion for summary judgment that no private cause of action is recognized for a violation of the rules of the National Association of Securities Dealers ("NASD"). We agree.

The rules established by self-regulatory bodies in the securities field, such as the NASD, must be approved by the Securities Exchange Commission and are

governed by Section 15 of the Securities Exchange Act of 1934. Courts have acknowledged that the Securities Exchange Act of 1934 did not explicitly provide for a private cause of action for violation of these rules. However, the courts are divided on the issue of whether congressional purpose and federal policy behind the Act imply an intent to allow such private causes of action. See, generally, Annotation (1981), 54 A.L.R.Fed. 11.

Two circuits have not recognized a private cause of action. See *Jablon v. Dean Witter & Co.* (C.A.9, 1980), 614 F.2d 677, 679, and *Parsons v. Hornblower & Weeks–Hemphill, Noyes* (M.D.N.C.1977), 447 F.Supp. 482, affirmed (C.A.4, 1978), 571 F.2d 203.

Some circuits recognize a private cause of action if accompanied by allegations of fraud, deception, or manipulation. See *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Goldman* (C.A.8, 1979), 593 F.2d 129, 134, and *Utah State Univ. of Agriculture & Applied Sciences v. Bear, Stearns & Co.* (C.A.10, 1977), 549 F.2d 164, 168, certiorari denied (1977), 434 U.S. 890, 98 S.Ct. 264, 54 L.Ed.2d 176.

However, two recent United States Supreme Court cases appear to be limiting the recognition of implied private causes of action under federal law. See *Transamerica Mtg. Advisors, Inc. v. Lewis* (1979), 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146, and *Touche Ross & Co. v. Redington* (1979), 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82. In the *Transamerica* case, the court held that it is not possible to infer a private cause of action merely because a statute proscribes certain conduct. *Transamerica*, 444 U.S. at 19, 100 S.Ct. at 246–247, 62 L.Ed.2d at 154–155. Congress' intent is to establish a private cause of action. *Id.* at 24, 100 S.Ct. at 249, 62 L.Ed.2d at 157–158.

Two more recent decisions from courts within the Sixth Circuit have followed the Ninth Circuit's reasoning in *Jablon* and found that no implied cause of action exists for a violation of NASD rules. *Kirkland v. E.F. Hutton & Co., Inc.* (E.D.Mich.1983), 564 F.Supp. 427, and *Emmons v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (S.D.Ohio 1982), 532 F.Supp. 480. We find these cases to be more persuasive and agree that no implied private cause of action exists for violations of an NASD rule. See, also, *Silverberg v. Thomson, McKinnon Securities, Inc.* (Feb. 14, 1985), Cuyahoga App. No. 48545, unreported, 1985 WL 6611.

Wherefore, we find that the trial court should have granted summary judgment to appellees on Count 8 of appellant's complaint.

Appellees did not move for summary judgment on appellant's ninth, tenth, and eleventh causes of action.

Appellees argued in their motion for directed verdict that appellant had not proven any of the causes of action alleged. At trial, appellant withdrew Counts 6, 9, and 10 of her complaint.

■ A directed verdict is appropriate if the court, "after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party * * *." Civ.R. 50(A)(4). The motion for directed verdict involves only a question of law. *Coleman v. Excello–Textron Corp.* (1989), 60 Ohio App.3d 32, 40, 572 N.E.2d 856, 865. Therefore, the issue is reviewed *de novo* by the court of appeals.

■ As to the breach of fiduciary duty claim, appellees argue that appellant had not proven that Spiegelburg owed any fiduciary duty or breached any fiduciary duty.

■ A broker and client are in a fiduciary relationship and, therefore, the broker owes the client a duty to disclose material information concerning investments. *Silverberg v. Thomson.*

In the case before us, we find that there was sufficient conflicting evidence to submit this case to the jury on this issue.

As for appellant's fraud claim, appellees argued that a directed verdict was required because there was no evidence of a false representation, no reliance by appellant on any representation, and no evidence that she suffered damages, since she sold the investment for more than she had paid for it.

Upon review of the evidence, we find that there was sufficient evidence as to each of these elements to warrant submission of the case to the jury.

With respect to a violation of federal securities law (Section 12[2] of the Securities Act of 1933), appellees presented the same arguments as they did in their motion for summary judgment. In addition, appellees argued that only the remedy of rescission is available to appellant for a violation of Section 12(2) of the Securities Act of 1933, that prejudgment interest cannot be determined by a jury, and that punitive damages are not recoverable. These additional arguments are considered below.

■ When a plaintiff no longer owns a security, he may recover damages for a violation of Section 12(2) of the Securities Act of 1933. However, the measure of damages is to be the equivalent of rescission. *Randall v. Loftsgaarden* (1986), 478 U.S. 647, 655–656, 106 S.Ct. 3143, 3148–3149, 92 L.Ed.2d 525, 536–537.

■ Prejudgment interest may be awarded at the trial court's discretion for a violation of federal securities law. *Mecca v. Gibralter Corp. of Am.* (S.D.N.Y.1990), 746 F.Supp. 338, 349. The *Mecca* case sets forth several factors that the trial court must consider to ensure that the award of prejudgment interest will result in equity. *Id.* Since the trial court has discretion to make

such an award, we do not find that the trial court abused its discretion in this case by delegating its decision to the jury.

The punitive damages issue will be discussed along with appellees' second cross-assignment of error.

■ With respect to a violation of R.C. 1707.41, appellees first argue that there was no evidence that appellant relied on the written comparison prepared by Spiegelburg because she testified that she did not understand it or what Spiegelburg discussed with her. Appellees also argued that there was no proof of a lack of diligence on Spiegelburg's part in ascertaining the omissions of any material fact in his comparison of the investments.

At trial, appellant testified that she decided to change her investments because she trusted Spiegelburg as a representative of Nationwide to select the best investments for her. She testified further that she could only understand from the comparison that if she had invested in the mutual funds initially (as compared to the variable funds of the Multi–Flex Annuity), she would have earned 3.5 percent more on her investment (27 percent versus 23.5 percent). Newdick testified that a one-year comparison between the investments did not give a fair and accurate review of the performance of the investments. Therefore, he believed that a failure to include a more comprehensive comparison of yearly average yields was a material omission. Spiegelburg himself testified that the information concerning past performances of both investments was available to him. He further testified that for two years prior to his comparison year, the annuity had outperformed the mutual funds. However, he believed in the long run, the mutual funds would outperform the annuity based on their history.

From this evidence, a jury could reasonably conclude that Spiegelburg omitted information readily available to him regarding the average yield for the mutual funds for a five- or ten-year period, thereby misleading appellant into believing that she could expect a twenty-seven percent rate of return. A jury could also reasonably conclude that appellant relied upon Spiegelburg's advice. Therefore, we find the trial court did not error in failing to direct a verdict in appellees' favor on this issue.

■ Next, appellees argued that rescission was the only remedy available to appellant under R.C. 1707.43 for a violation of R.C. 1707.41.

R.C. 1707.41 provides that:

" * * * any person who, by a written or printed circular, prospectus, or advertisement, offers any security for sale, or receives the profits accruing from such sale, is liable, to any person who purchased such security relying on such circular, prospectus, or advertisement, for the loss or damage sustained by such

relying person by reason of the falsity of any material statement contained therein or for the omission therefrom of material facts, unless such offeror or person who receives the profits establishes that he had no knowledge of the publication thereof prior to the transaction complained of, or had just and reasonable grounds to believe such statement to be true or the omitted facts to be not material. * * * Lack of reasonable diligence in ascertaining the fact of such publication or the falsity of any statement contained in it or of the omission of such material fact shall be deemed knowledge of such publication and of the falsity of any untrue statement in it or of the omission of material facts."

Rescission is not the only remedy available for a violation of R.C. 1707.41. That section specifically provides for the recovery of "loss or damages sustained." The defrauded investor could elect to rescind the purchase under R.C. 1707.43, but is not required to do so. See 2 Seaver, Ohio Corporation Law (1990) 377, Section L, and Friedman, Ohio Securities Law & Practice (1993) 513, Section 43.01.

Appellees next argued that appellant suffered no damages because she sold the mutual fund investment for more than she had purchased it. Appellees' argument is premised on their belief that appellant must seek the remedy of rescission under R.C. 1707.43. Since this premise is erroneous, appellees' argument regarding damages is also found to be without merit.

Finally, appellees argued that punitive damages are unavailable for a violation of R.C. 1707.41. This issue is covered by appellees' second cross-assignment of error and will be considered in our discussion of that assignment of error.

Appellees' first cross-assignment of error is not well taken in part and well taken in part.

In their second cross-assignment of error, appellees argue that appellant did not submit any proof in this case which would justify submission of the issue of punitive damages to the jury.

Punitive damages may be awarded in common-law fraud cases. *Roberts v. Mason* (1859), 10 Ohio St. 277, paragraph one of the syllabus, and *Preston v. Murty* (1987), 32 Ohio St.3d 334, 512 N.E.2d 1174. The plaintiff must establish, in addition to the prima facie elements of fraud, "that the fraud is aggravated by the existence of malice or ill-will, or must demonstrate that the wrongdoing is particularly gross or egregious." *Charles R. Combs Trucking, Inc. v. Internatl. Harvestor Co.* (1984), 12 Ohio St.3d 241, 12 OBR 322, 466 N.E.2d 883, paragraph three of the syllabus. See, also, *Logsdon v. Graham Ford Co.* (1978), 54 Ohio St.2d 336, 339, 8 O.O.3d 349, 351–352, 376 N.E.2d 1333, 1335–1336.

Punitive damages are not recoverable under a statutory cause of action if the statutory cause of action was created in derogation of the common law. *Kleybolte v. Buffon* (1913), 89 Ohio St. 61, 66, 105 N.E. 192, 193–194. The Sixth Circuit has compared Ohio's blue sky law (R.C. 1707.01 *et seq.*) with Ohio's common law regarding fraud actions and has concluded that these causes of action are not identical. *Nickels v. Koehler Mgt. Corp.* (C.A.6, 1976), 541 F.2d 611, 616, certiorari denied (1977), 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792. R.C. 1707.41 has been interpreted as providing for a lower level of scienter to prove a violation of the Act than would be required under an action for common-law fraud. See *Nickels v. Koehler* and Farmer & Feldman, Fraud and Securities Transaction: A Comparison of Civil Remedies Under the Ohio Securities Act, The Uniform Securities Act, The Federal Securities Acts (1980), 49 U.Cin.L.Rev. 814, 825–826.

We are unable to locate any case which has considered the issue of whether R.C. 1707.41 allows punitive damages to be awarded. Since the Sixth Circuit has indicated that the elements of common-law fraud and a violation of this section are not identical, we hold that punitive damages are not available to the plaintiff, since they are not specifically authorized by the statute.

Finally, we hold that punitive damages are not available for a violation of Section 12(2) of the Securities Act of 1933 because that section specifically limits the amount of damages recoverable. *Hatrock v. Edward D. Jones & Co.* (C.A.9, 1984), 750 F.2d 767, 771; *Jones v. Miles* (C.A.5, 1981), 656 F.2d 103, 107, at fn. 8, and *Hill York Corp. v. Am. Internatl. Franchises, Inc.* (C.A.5, 1971), 448 F.2d 680, 697.

We conclude that the trial court erred in submitting the punitive damages issue to the jury in connection with the causes of action for violation of Ohio and federal securities law. However, the court could properly submit the issue with respect to the common-law fraud claims. Appellees' second cross-assignment of error is found well taken in part and not well taken in part.

Accordingly, the judgment of the Erie County Court of Common Pleas is affirmed in part and reversed in part. This case is remanded to the trial court for further proceedings consistent with this opinion. Pursuant to App.R. 24, the parties shall equally divide the court costs incurred on appeal.

*Judgment affirmed in part,*
*reversed in part*
*and cause remanded.*

MELVIN L. RESNICK and SHERCK, JJ., concur.