TITANIUM INDUSTRIES, Appellee,

v.

S.E.A., INC., Appellant.

[Cite as *Titanium Industries v. S.E.A., Inc.* (1997), 118 Ohio App.3d 39.]

Court of Appeals of Ohio,
Seventh District, Mahoning County.

No. 94 C.A. 130.

Decided Jan. 29, 1997.

40

*Michael A. Cyphert, Walt A. Linscott* and *Daniel M. Haymond,* for appellee.

·*Ronald A. Rispo, William H. Baughman, Jr.,* and *Thomas L. Davis,* for appellant.

GENE DONOFRIO, Judge.

Defendant-appellant, S.E.A., Inc. ("SEA"), appeals from a judgment of the Mahoning County Common Pleas Court in favor of plaintiff-appellee, Titanium Industries ("Titanium"), following a jury verdict in favor of Titanium.

Titanium is involved in the business of fabricating and distributing titanium products. SEA is a firm engaged in the business of providing scientific and engineering consulting services.

On April 2, 1993, Titanium filed a complaint against SEA alleging negligent misrepresentation, breach of contract, and violations of Ohio's Deceptive Trade Practices Act (R.C. 4165.01 *et seq.*). The allegations in the complaint centered around the performance by SEA of a Phase I environmental assessment on property in Austintown, Ohio owned by Youngstown Welding, which company Titanium had previously entered into negotiations to purchase. The complaint alleged that SEA had breached its duty to Titanium by not revealing the presence of environmental contamination on Youngstown Welding's property.

Trial to a jury began on May 5, 1994. At trial, testimony established that on June 16, 1989, Titanium and SEA entered into a contract for the performance of a Phase I environmental assessment. Stephen Gauntner, contracting officer for SEA, testified that he was contacted on June 13, 1989 by Attorney Robert Fulton, on behalf of an unnamed client, and asked to perform an environmental assessment on the subject property. Gauntner testified that when Fulton told him that Youngstown Welding was a manufacturer of steel products and special alloy pipes, he suggested to Fulton that a Phase II assessment, which would have included soil testing, be done on the property. Gauntner testified that Fulton declined this offer.

Gauntner testified that the parties then agreed that a Phase I assessment would be conducted. In a proposal approved by Fulton on June 16, 1989, the parties agreed that the Phase I assessment would embody document examination (which would include a review of "Ohio EPA documents that are available as public record to examine any permits, agency site investigations, or notices of violations that may have been issued and that may give notice to any existing risks on the subject property * * *" and a site inspection using a hnu photoionization monitor ["PID"]). Gauntner testified that a PID is used to measure volatile organics and that it does not detect metals. The parties agreed that the assessment would be completed and SEA's report submitted by the time for the closing of the sale on June 29, 1989.

SEA assigned Sharon Roney to conduct the assessment of the Youngstown Welding property. Roney testified that she made an inspection of the site on June 22, 1989. At that time, she met with Paul Agler, an engineer employed by Youngstown Welding since 1953, using SEA's environmental questionnaire.

Roney testified that Agler furnished her with incomplete information. She testified that Agler told her that there was no on-site disposal of any hazardous waste and that the hazardous waste generated on the site was shipped to Envirite Corporation for disposal. Roney further testified that Agler indicated that the

company had no notices of violation for hazardous waste. Roney testified that Agler did not tell her about a lagoon on the property used to collect pickling acid that the company had filled in years before. Roney also testified that Agler did not tell her that underground storage tanks existed on the property. Finally, Roney testified that when she asked if there were any aerial photographs available for the facility, Agler gave her a photocopy of a photograph rather than the photograph itself. During trial, Titanium presented the photograph itself as evidence, which photograph Roney testified she had never seen. Titanium's expert later testified that disturbed areas and discolorations in the soil could be seen on Plaintiff's Exhibit 19. These disturbed areas could not be seen on Defendant's Exhibit 27.

Contrary to Roney's testimony, Agler testified that he did not recall being asked the questions set forth on Roney's questionnaire.

In connection with her assessment, Roney contacted by telephone certain offices and divisions of the Ohio E.P.A. to locate any documents relating to the property. Roney testified that she was told that the agency had no files for the property.

Roney testified that, prior to June of 1989, she had experience in obtaining documents from the Northeast District Office of the Ohio E.P.A. She testified that, during that time frame, she generally called the information officer and asked whether they had any files on a particular company and asked to review them. Roney testified that she did this in the instant case. Roney further testified that she had previously been employed by Ohio E.P.A.

Roney further testified that Ohio E.P.A.'s information officer, Ms. Toumazos, indicated that they did not have any files to review. Roney testified that she asked Toumazos who the R.C.R.A. (Resource Conservation and Recovery Act) inspectors were for the county to double check with them as to whether they would have something that they may not have written down. Roney testified that Toumazos told her that Dennis Busch and Dave Goulish were the R.C.R.A. inspectors in the hazardous waste program.

Roney further testified that she called the hazardous waste division as opposed to some other division of the Ohio E.P.A. since the primary concern at this time would have been Youngstown Welding's handling of hazardous waste. Roney testified that she contacted these two gentlemen by telephone and that they indicated to her that they had no files for the facility and that they had not inspected it. Roney testified that, while she was familiar with the Ohio Freedom of Information Act, she did not make a written request for the documents because the time frame for her report was very limited and there would not have been enough time to write a letter and get a response from Ohio E.P.A. within the time allotted for her report.

In connection with its cross-examination of Roney, Titanium introduced Plaintiff's Exhibit 8, which consists of a certificate of David Lee, Group Leader of the Division of Surface Water, Ohio E.P.A., and attached documents which were allegedly produced by or for the Ohio Department of Health in 1970 and 1971. The documents identify the presence of an acid lagoon on the Youngstown Welding site. Lee's certificate states that the documents attached to his certificate " * * * are documents maintained in the public record of the Ohio EPA, Northeast District Office."

Lee's certificate authenticated the attached documents alleged to be public records. Titanium also used the affidavit, over the objection of SEA, in arguing that the documents found in Exhibit 8 were located in the files of the Ohio E.P.A. in 1989 when Roney telephoned the agency, seeking documents pertaining to Youngstown Welding. Titanium inferred that, had Roney submitted a written request for records, the documents found in Exhibit 8 would have been provided to her, disclosing the existence of the lagoon, and thus indicating that soil sampling should be done.

Evidence at trial established that Roney issued a status letter dated June 27, 1989 to Fulton. The letter outlined the results of the site visit and noted problems with waste water discharges and potential problems with the sixteen electrical transformers found on the property.

On June 27, 1989, the board of directors of Titanium met and voted to purchase the stock of Youngstown Welding for $4,000,000.

On June 29, 1989, SEA issued its final report on the Phase I assessment. The report states in part:

"The handling of hazardous waste generated on the property appears from the site inspection to be in compliance with the current Resource Conservation and Recovery Act (RCRA) regulations. The waste is spent acid from the pickling and bright dip operations. This waste is hauled by Envirite to their facility in Canton, Ohio for treatment. The facility notified U.S. EPA and Ohio EPA as a large quantity generator of hazardous waste in November of 1980 and was assigned the ID number OHD004169488. No inspections for hazardous waste compliance have been performed by Ohio EPA to date.

" * * * The site visit and document review of the Weldco facility indicate that the property is in good condition and in compliance with most environmental regulations. * * * "

In addition to the foregoing, the final report indicated that the facility was out of compliance with Ohio's current air permit regulations. The report also noted potential problems regarding non-permitted discharges of waste water from the

facility. Finally, the report noted that the electrical transformers on the property must be assumed to contain PCBs and should be treated as such.

In June 1992, Ohio E.P.A. received information from an anonymous employee that PCB containing material had been dumped on the property now owned and operated by Titanium. Charlotte Hammar, an employee of Ohio E.P.A., testified that she conducted an investigation pertaining to this complaint and did a general comprehensive investigation. The investigation revealed that some of the electrical transformers on the property were leaking material which must be assumed to contain PCBs and that testing was required.

In June 1992, investigators from Ohio E.P.A. conducted a further investigation of the facility and took soil samples. The soil samples taken by Ohio E.P.A. and some samples taken later by another consulting firm employed by Titanium revealed that a large amount of soil located in five areas on the property contained hazardous waste (lead and chromium). Evidence at trial established that thousands of tons of contaminated soil needed to be removed from the property at a cost in excess of $1,600,000.

At trial, Titanium's expert, Dr. Thomas Birch, testified extensively over the objection of SEA's counsel as to the shortcomings perceived by him in SEA's performance. Dr. Birch's testimony included criticism of Roney's failure to file a written request for documents with Ohio E.P.A. under the Freedom of Information Act. Dr. Birch testified that he had previously been employed by Ohio E.P.A. and that he knew that when Ohio E.P.A. was formed in 1973, the files of the Ohio Board of Health which pertained to environmental matters were transferred to Ohio E.P.A., which agency became the custodians and managers of the information. Dr. Birch also testified that SEA had been negligent in representing that the handling of hazardous waste generated on the property appeared from the site inspection to be in compliance with the current R.C.R.A. regulations. Dr. Birch also testified that SEA had been negligent in not obtaining an aerial photograph of the premises.

SEA's expert, Charles Blake, testified that, in his opinion, SEA had performed within acceptable levels of care and practice in existence at the time. The trial court sustained Titanium's objection to Blake's testimony as to whether SEA had performed consistent with the provisions of the parties' contract.

Both of the parties' experts, as well as a number of other witnesses, testified that the detection of lead and chromium in the soil could only be achieved through soil sampling and testing.

At the close of Titanium's case, the trial court granted SEA's motion for directed verdict on Titanium's claim of deceptive trade practices but denied SEA's motions for directed verdict on the other claims.

At the close of all the evidence, the trial court granted Titanium's motion for a directed verdict as to liability on its claim of negligent misrepresentation. The trial court instructed the jury that it had determined as a matter of law that SEA had negligently misrepresented the condition of the Youngstown Welding facility. The trial court instructed the jury that, on the negligent misrepresentation claim, the only issues left for their consideration were whether SEA's misrepresentation had directly and proximately caused Titanium's damages, whether Titanium had been contributorily negligent, and the amount of damages.

The jury returned a verdict for Titanium on the negligent misrepresentation claim and awarded damages in the amount of $2,716,000. The jury also returned a verdict in favor of Titanium on the breach of contract claim and awarded damages in the amount of $250,000.

SEA then filed this appeal.

SEA has listed four assignments of error. In the first, SEA argues:

"The trial court committed reversible error by granting a directed verdict in favor of the plaintiff as to liability on the claim of negligent misrepresentation because reasonable minds could reach different conclusions on the issues of defendant's exercise of reasonable care in obtaining the information communicated and of plaintiff's reliance on the information communicated based on the evidence presented at trial."

Appellant argues that, in order for liability to exist on a claim of negligent representation, it must be clear that (1) the defendant supplied false information; (2) the plaintiff justifiably relied on that information; and (3) the defendant failed to exercise reasonable care or competence in obtaining the information, citing *Haddon View Invest. Co. v. Coopers & Lybrand* (1982), 70 Ohio St.2d 154, 24 O.O.3d 268, 436 N.E.2d 212.

SEA argues that, in the instant case, reasonable minds could reach more than one conclusion as to whether SEA exercised reasonable care and competence in obtaining the information set forth in its report. SEA cites the conflicting testimony of Dr. Birch and its own expert, Charles Blake, in arguing that this conflicting testimony created an issue for the jury's determination.

In addition, SEA argues that reasonable minds could reach different conclusions as to whether the statements complained of in SEA's report constituted false information. SEA argues that, from the site inspection itself, it did appear that there was compliance with R.C.R.A. regulations.

In addition, SEA argues that reasonable minds could reach different conclusions on the issue of justifiable reliance. SEA notes that the board of directors of Titanium approved the purchase of the Youngstown Welding stock two days before SEA issued its report. In addition, SEA points to the testimony of Robert

Fisher, president of Youngstown Welding at the time of the stock sale. Fisher testified that, at the time SEA made its inspection of the facility, he already considered Robert Paddock, president of Titanium, to be his boss.

In response, Titanium first argues that SEA imposed a higher standard of care upon itself by representing in its brochures that its capabilities as environmental investigators were "unsurpassed" and that it was the "leader" in the environmental consulting profession. Titanium further argues that even if the standard of care was one of ordinary care, reasonable minds could not differ regarding SEA's failure to adhere to the standard of care. Titanium relies upon the testimony of its expert, Dr. Birch. Titanium argues that SEA's own expert testified consistently with Dr. Birch that a Phase I environmental assessment does not get into sufficient detail to properly address the R.C.R.A. compliance of a facility.

Titanium also argues that there was no question that the statements of Roney in the report were false. Titanium argues that the R.C.R.A. program is extremely complex and that rendering a statement that a facility is in compliance with R.C.R.A. required far more effort than SEA put forth. Accordingly, Titanium argues that SEA was clearly negligent in making any representation concerning R.C.R.A. compliance.

In addition, Titanium argues that the issue of justifiable reliance was decided by the jury. In support, Titanium points to the court's instructions to the jury that they were still to decide whether Titanium was contributorily negligent.

Titanium further argues that even if the trial court did determine the issue of justifiable reliance, it was proper in doing so. In this regard, Titanium points to the evidence that the SEA report was incorporated into and was made a part of the actual purchase agreement for the Youngstown Welding facility.

When reasonable minds can reach different conclusions from the evidence presented, a motion for directed verdict should be denied. *Ziegler v. Wendel Poultry Serv., Inc.* (1993), 67 Ohio St.3d 10, 12–13, 615 N.E.2d 1022, 1026–1027. The determination to be made by a trial court when a motion for directed verdict has been made is not whether one version of the facts presented is more persuasive than another; rather, it is a determination that only one result can be reached under the theories of law presented in the complaint. *Eldridge v. Firestone Tire & Rubber Co.* (1985), 24 Ohio App.3d 94, 24 OBR 164, 493 N.E.2d 293. The trial court must neither consider the weight of the evidence nor the credibility of witnesses in disposing of a directed verdict motion. Thus, if there is competent evidence to support the party against whom the motion is made, upon which evidence reasonable minds might reach different conclusions, the motion must be denied. *Strother v. Hutchinson* (1981), 67 Ohio St.2d 282, 284–285, 21 O.O.3d 177, 178–179, 423 N.E.2d 467, 469–470. Rulings on motions for directed

verdict are subject to *de novo* review on appeal. *Byrley v. Nationwide Ins. Co.* (1994), 94 Ohio App.3d 1, 18, 640 N.E.2d 187, 198, discretionary appeal not allowed in (1994), 70 Ohio St.3d 1441, 638 N.E.2d 1044,

■ Applying these standards to the instant case, we find that the trial court erred in directing a verdict against SEA on the issue of negligent misrepresentation. From the conflicting evidence presented, reasonable minds could reach different conclusions on the issues of the proper standard of care to be used by SEA as well as whether SEA exercised reasonable care in obtaining its information. For example, Dr. Birch testified that a customary standard of care for the conduct of Phase I assessments had been established for the environmental consulting industry in Ohio by June 1989. In contrast, Mr. Blake testified that the standard of care was still being defined at this time and that its parameters were not so clear. While Dr. Birch testified that SEA's report did not meet the standard of care in place in the industry in 1989, Blake testified that he found Roney's and SEA's work consistent with the practice at the time.

Further, Dr. Birch testified that, in regard to the method used by Roney to contact Ohio E.P.A., a phone call is ineffective. Dr. Birch testified that, in 1989, the agencies were overwhelmed with requests and that they were using the freedom of information request letter as a screening technique so that until they got the letter, Ohio E.P.A. did not respond to the request. In contrast, Roney testified that she had worked for Ohio E.P.A. and that she had obtained documents in the past by way of a phone call.

Further, while Dr. Birch outlined what he perceived as deficiencies in SEA's work, Mr. Blake testified that an R.C.R.A. compliance audit is distinct from a Phase I environmental assessment and that he was impressed by Roney's performance in outlining the problems which she cited in her report. Blake further testified that it was his opinion that Roney's report gave Titanium a good indication of what it was dealing with, that the plant was one which dealt with hazardous waste, and that this was something Titanium should be cautious about. Blake further testified that, on the issue of any buried waste, it was his opinion that Roney had been deceived and that Roney had not uncovered anything which should have made her suspicious.

Based upon the foregoing, we find that there was conflicting evidence as to the elements of negligent misrepresentation such that reasonable minds could have reached different conclusions and that the trial court thus erred in directing a verdict on that claim.

The first assignment of error is found to have merit.

In the second assignment of error, SEA argues:

"The trial court committed reversible error in admitting into evidence the affidavit of David Lee on the issue of whether certain documents existed in the files of the Ohio Environmental Protection Agency at the time that defendant conducted the work relevant to this case because such affidavit constitutes inadmissible heresay [*sic*]."

SEA argues that the certificate of David Lee, as part of Plaintiff's Exhibit 8, constituted inadmissible hearsay. SEA acknowledges that Lee's certificate contained no statement regarding the whereabouts of the documents attached to it in June 1989. However, SEA argues that Titanium improperly used Lee's certificate to infer that the documents attached to it, which had originated in the Ohio Board of Health in 1970 and 1971, were in the files of Ohio E.P.A. in June 1989 and that, had Roney filed a written request with Ohio E.P.A., such documents would have been provided to her.

Titanium responds by arguing that certified copies of public records are self-authenticating under Evid.R. 902(4) and that the Exhibit 8 documents were admissible as self-authenticating public records. Titanium argues that to hold that the Exhibit 8 certificate constitutes inadmissible hearsay would be the equivalent of reading Evid.R. 902(4) and Civ.R. 44 out of the Rules of Evidence and Rules of Civil Procedure.

We do not agree with appellant that Lee's certificate constituted inadmissible hearsay. "Hearsay" is defined in Evid.R. 801(C) as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." A "statement" is defined in Rule 801(A) as "(1) an oral or written assertion or (2) nonverbal conduct of a person, *if it is intended by him as an assertion.*" (Emphasis added.)

There is nothing in Lee's certificate to suggest that he intended to assert that the documents attached to it were located in the files of Ohio E.P.A. in June 1989. Thus, such an inference cannot be labeled inadmissible hearsay.

Despite this determination, we nonetheless find that the trial court erred in allowing appellee to use the Exhibit 8 certificate as it did. Lee's certificate, which was dated May 4, 1994, simply stated that the documents attached to it were maintained in the public record of Ohio E.P.A., Northeast District Office. Appellee used this document to infer that the documents were maintained in that office in June 1989 and to further infer that had Roney made a written request for the documents, they would have been provided to her. In our view, such a use resulted in the creation of an inference upon an inference, which is impermissible.

It is well established in Ohio that an inference which is based solely upon another inference and which is unsupported by any additional fact or another

inference from other facts is an inference upon an inference and is condemned. *Hurt v. Charles J. Rogers Transp. Co.* (1955), 164 Ohio St. 329, 333, 58 O.O. 122, 124, 130 N.E.2d 820, 823; *Rose v. Cardinal Industries, Inc.* (1990), 68 Ohio App.3d 406, 409, 588 N.E.2d 947, 948–949. The principle underlying this rule is that the foundation of the second inference is so insecure that reliance upon it would result in an inferred fact which is merely speculative in nature. *State v. Ebright* (1983), 11 Ohio App.3d 97, 99, 11 OBR 150, 151–152, 463 N.E.2d 400, 402–403.

Under the circumstances of the instant case, the use of Lee's certificate resulted in an impermissible inference. Appellee has argued that for this court to find that the use of the certificate was improper would be to disregard the self-authenticating nature of public documents as established by the Rules of Evidence and Rules of Civil Procedure. We disagree.

The issue with regard to plaintiff's Exhibit 8 was not whether the documents attached to Lee's certificate were authentic or were located in the public record of Ohio E.P.A. in May 1994. Rather, given the fact that the documents attached to the certificate originated in the Ohio Board of Health in 1970 or 1971 and were, at some point, transferred to Ohio E.P.A., the issue became at what point did the documents come into the hands of Ohio E.P.A. Such an issue could not be resolved by use of affidavits or certificates, which, under the case law of this state, are insufficient to establish material facts at trial. And while appellee has pointed out that Dr. Birch testified that the records of the Board of Health were transferred to Ohio E.P.A. with the latter's creation in 1973, such testimony was not, in our view, enough to cure the impermissible and prejudicial nature of the inference created by the use of the certificate. Rather, appellee should have had a representative from Ohio E.P.A. testify, subject to cross-examination as to the exact location of the Board of Health documents in June 1989 or, at the very least, a limiting instruction should have been given to the jury regarding the purpose for which the certificate could be used. In the absence of such testimony or limiting instruction, we find that prejudicial error resulted.

The second assignment of error is found to have merit in part.

In the third assignment of error, SEA argues:

"The trial court committed reversible error in excluding the opinion of defendant's expert, Charles Blake, regarding whether defendant performed consistent with its contract with plaintiff because opinions as to ultimate issues are admissible and the trial court had permitted plaintiff's expert to testify extensively as to his opinion that defendant had not performed the contract."

SEA properly relies on Evid.R. 704, which provides that testimony in the form of an opinion otherwise admissible is not objectionable solely because it embraces

an ultimate issue of fact, in arguing that the trial court erred in sustaining Titanium's objection to Blake's testimony as to whether SEA had fulfilled the terms of the contract. SEA argues that unfairness resulted since the trial court permitted Titanium's expert, Dr. Birch, to testify extensively on direct examination as to the shortcomings perceived by him in SEA's performance.

In response, Titanium argues that there was no error since Blake's opinion as to whether SEA breached its contract with Titanium was of no assistance to the jury and, therefore, the trial court acted within its discretion in excluding the testimony. In addition, Titanium argues that any error in the exclusion of some of Blake's testimony was harmless since Blake was permitted to give his opinion as to whether SEA had exhibited the required standard of care for a Phase I environmental assessment.

A review of the record shows that both Dr. Birch and Blake testified with regard to the standard of care for a Phase I environmental assessment and as to whether SEA had met that standard of care. In addition, however, the record discloses that Dr. Birch also testified that, in his opinion, SEA had not conducted a historical document examination as set forth in the parties' contract. Such testimony was admitted over the objection of appellant's counsel. Yet, when appellant's counsel attempted to counter Dr. Birch's testimony with regard to document examination with testimony from Blake, the trial court sustained appellee's objection. Given the admission of Dr. Birch's testimony in this regard, we find this ruling of the trial court to have been improper and prejudicial. In addition, we find that the trial court's exclusion of Blake's remaining testimony, *i.e.*, testimony as to whether the damages suffered by Titanium were the responsibility of SEA due to a faulty performance of the Phase I assessment, was also improper. While rulings on the admission of expert testimony are within the discretion of the trial court, given the admission of Dr. Birch's testimony in this case, we find that the trial court erred in excluding Blake's.

The third assignment of error has merit.

In the fourth and final assignment of error, SEA argues:

"The trial court committed reversible error in instructing the jury on damages for negligent misrepresentation and breach of contract and in submitting verdict forms for both claims because such instructions and verdict forms resulted in the jury's award of double recovery to plaintiff."

At the close of the evidence, the trial court gave the jury separate instructions on damages for negligent misrepresentation and breach of contract and submitted to the jury verdict forms for both claims, each of which provided for the insertion of an amount of damages. The jury returned a verdict on the negligent

misrepresentation claim in the amount of $2,716,000 and a verdict on the breach of contract claim in the amount of $250,000.

In the fourth assignment of error, SEA argues that, in giving instructions as to both tort and contract damages, and in submitting verdict forms for each claim, the trial court committed prejudicial error since the instructions and verdict forms resulted in the award of a double recovery to Titanium.

SEA argues that Titanium presented evidence as to incurred clean-up costs in the amount of $1,646,661, future clean-up costs in the amount of $991,000, and the purchase price for the stock of Youngstown Welding in the amount of $4,000,000. SEA argues that Titanium made no attempt in the testimony of its only damage witness, Joseph Ferment, chief financial officer of Titanium or in closing argument to apportion these damages between the negligent misrepresentation and breach of contract claims.

We find that, given the manner in which the jury was instructed herein, there was a possibility created of a double recovery. Appellant's alleged duty of due care was closely tied to its alleged duties under the contract. Further, there was no testimony apportioning the damages between the two claims. There thus existed the possibility that the jury would, in finding for appellee on both claims, award duplicate damages for the same pecuniary injury. Under such circumstances, the jury should have, at the least, been cautioned that such an award would be improper. See, generally, *Jurgens Real Estate Co. v. R.E.D. Constr. Co.* (1995), 103 Ohio App.3d 292, 296, 659 N.E.2d 353, 355–356.

The fourth assignment of error is found to have merit.

Based upon the foregoing, the judgment of the trial court is hereby reversed, and this matter is remanded for a new trial.

*Judgment reversed*
*and cause remanded.*

JOSEPH E. O'NEILL, P.J., concurs.

Cox, J., dissents.

Cox, Judge, dissenting.

I respectfully dissent.

The appellant even admitted that the representations and the information that it provided to the appellee was erroneous. The appellant held itself out as an expert and the evidence demonstrated that it failed to adhere to the standards of the industry or the standards of ordinary care. The jury decided that the appellee had justifiably relied on the information supplied by the appellant, which

was its prerogative. They further found that the appellee had relied on these representations made by the appellant and was damaged.

As to the evidentiary matters, the one record was a public record and the court was correct in admitting it into evidence. As to the expert, the hypothetical was flawed and the court was again correct in excluding it.

I see no reason to reverse the trial court on evidentiary issues nor the jury on its finding. I would affirm.